*TH*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EQUIPOISE PM LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| INTERNATIONAL TRUCK AND | ) No. 05 C 6008 |
| ENGINE CORP., JOHN PRICE | ) |
| INTERNATIONAL TRUCK, INC., | ) Judge Ronald A. Guzmán |
| DANIEL USTIAN, Y. MARC BELTON, | ) |
| EUGENIO CLARIOND, JOHN | ) |
| CORRENTI, ABBIE J. GRIFFIN, | ) |
| MICHAEL HAMMES, JAMES H. | ) |
| KEYES, ROBERT C. LANNERT, | ) |
| DAVID MCALLISTER, SOUTHWOOD | ) |
| J. MORCOTT, WILLIAM J. PATIENT, | ) |
| PAUL KOVACH, PAUL GRZEMSKI | ) |
| and LARRY WAKE, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| INTERNATIONAL TRUCK AND | ) |
| ENGINE CORP., J. PRICE | ) |
| INTERNATIONAL TRUCK, INC., | ) |
| n/k/a K. NEAL INTERNATIONAL | ) |
| TRUCKS, INC., | ) |
| | ) |
| Defendants-Counterplaintiffs and | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| EQUIPOISE PM LLC, JOHN | ) |
| PRICE and KEITH MORTON, | ) |
| | ) |
| Plaintiff-Counterdefendant and | ) |
| Third-Party Defendants. | ) |
| | ) |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Equipoise PM LCC ("Equipoise") has sued International Truck and Engine Corp. ("ITEC"), John Price International Truck, Inc. ("JPI"), Daniel Ustian, Y. Marc Belton, Eugenio Clariond, John Correnti, Abbie J. Griffen, Michael Hammes, James H. Keyes, Robert C. Lannert, David McAllister, Southwood J. Morcott, William J. Patient (the "ITEC directors") and Paul Kovach, Paul Grzemski and Larry Wake (the "JPI directors") for their alleged violation of the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221 and for specific performance, tortious interference with contract and breach of fiduciary duty. Defendants have moved pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss Counts I, III, IV and V of the complaint and plaintiff/counter-defendant Equipoise and third-party defendants John Price and Keith Morton have moved pursuant to Rule 12(b)(6) to dismiss Counts II and VI of ITEC and JPI's counterclaim and third-party complaint. For the reasons set forth below, both motions are granted in part and denied in part.

## Facts

ITEC is a manufacturer of trucks and truck parts. (Compl. ¶ 5.) JPI is one of ITEC's dealers. (*Id.* ¶ 7.) ITEC and Equipoise are the sole shareholders of JPI. (*Id.* ¶¶ 11-12.) Price and Morton are the two members of Equipoise. (*Id.* ¶ 4; Counterclaim ¶ 6.)

On August 17, 2001, Equipoise and ITEC executed an agreement for the purchase of JPI's stock. (Compl. ¶¶ 11-12.) Pursuant to this agreement, ITEC purchased more than half of JPI's Class A stock, the only voting stock, and Equipoise purchased 5,000 of the 45,000 shares of Class B stock. (*Id.*, Ex. A, Stock Purchase Agreement at 1.) The agreement identifies Equipoise as the "Operator" of JPI and gives Equipoise the right to purchase ITEC's shares "from funds received by

Operator as dividends, interest or bonus from [JPI]," "with readily available funds from any source within sixty (60) days of the receipt of [JPI's] audited year-end financial statement" or at any other time with ITEC's consent. (*Id.*)

The agreement states, however, that Equipoise's stock purchase rights "shall automatically expire when and if John R. Price . . . ceases, for any reason, to be President of [JPI]." (*Id.* at 2.) Moreover, it says:

> The parties recognize that [ITEC] owns all the voting stock and may use such voting power to remove Price as Director and to cause his removal as President of [JPI]. Nothing in this Agreement shall affect this right or any other rights which [ITEC] may have by reason of its voting control of [JPI].

(*Id.* at 4; *see id.* (stating that "[t]he Operator recognizes and acknowledges the absolute right of the Board of Directors of [JPI] to remove him as its President at any time.").

The same day, ITEC and JPI signed a dealer agreement. (Compl., Ex. B, Dealer Sales/Maintenance Agreement.) That agreement "governs the relation between [JPI] and [ITEC] in promoting the sale of [ITEC's products], in their purchase and sale by [JPI], and in providing warranty and other services for users." (*Id.* at 3.)

The last agreement between the parties is a bonus agreement. That agreement requires JPI to pay a bonus to Equipoise equal to thirty-five percent of JPI's earnings at the end of each fiscal year. (Counterclaim, Ex. B, Bonus Agreement at 1.) The agreement says that it was made by and between "[JPI] and Equipoise," but it contains promises made individually by Price. (*Id.*)

On February 28, 2005, Equipoise notified ITEC that it intended to exercise its right to purchase stock pursuant to the stock purchase agreement. (Compl., Ex. C, Letter from Hershman to JPI Board of 1/28/05.) The following day, the JPI directors removed Price as president.

3

(Compl. ¶ 22.) Though Equipoise had exercised its option while Price was still JPI's president, ITEC refused, and continues to refuse, to sell its JPI stock to Equipoise. (*Id.* at ¶¶ 22-24.)

## Discussion

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

### Defendants' Motion – Count I

In Count I, Equipoise asserts a claim against ITEC for violation of the Automobile Dealer Day in Court Act ("ADDCA"). ITEC says this claim should be dismissed because: (1) Equipoise is not a dealer within the meaning of the ADDCA; (2) the claim is not based on the performance, termination, cancellation or refusal to renew a franchise agreement, as is required by the statute; and (3) the complaint fails to allege lack of good faith, an essential element of an ADDCA claim. The Court finds none of these arguments persuasive.

The ADDCA defines a dealer as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). Equipoise alleges that it is a corporation operating under a franchise agreement that is engaged in the sale and distribution of trucks. That is all the statute requires.

4

Though Equipoise has alleged the statutory factors, ITEC contends that its status as a shareholder of a dealership precludes it from being a dealer within the meaning of the ADDCA. The Seventh Circuit addressed this issue in *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710 (7th Cir. 1965). The parties in that case had entered into a number of agreements whereby the dealership corporation Dan Kavanaugh Ford, Inc. was created, and Kavanaugh was designated as the operator of the dealership. *Id.* at 712-14. Under those agreements, Ford was the majority shareholder and Kavanaugh the minority shareholder of the dealership corporation, with ownership to be transferred gradually to Kavanaugh. *Id.* at 712. Ford retained all voting rights in the dealership corporation until Kavanaugh purchased all of Ford's shares. *Id.* The agreements also provided that Kavanaugh would be employed at-will as president and director of the dealership corporation and that he had to sell his stock to Ford if his employment was terminated. *Id.* at 712-13. Kavanaugh was removed as president and director of the dealership corporation, which forced him to sell his shares to Ford. *Id.* at 715. Thereafter, he filed an ADDCA suit against Ford. *Id.* at 711.

Ford argued that the ADDCA claim should be dismissed because the dealership corporation, not Kavanaugh, was the dealer. *Id.* at 715. The Seventh Circuit disagreed. *Id.* The main purpose of the ADDCA, the court noted, is to balance "the disparity in bargaining power between manufacturers and their locally franchised representatives." *Id.* at 716. That purpose would be defeated if manufacturers were allowed to structure dealership agreements to make the dealership corporations that they own the dealer for purposes of the ADDCA. *Id.* at 717. Because the minority shareholder, Kavanaugh, was deemed essential to the operation of the dealership, the court held that he was a dealer within the meaning of ADDCA. *Id.* at 717-18.

5

In this case, Equipoise is in the same position relative to ITEC, as Kavanaugh was to Ford. As in *Kavanaugh*, the purpose of the ADDCA would be frustrated if JPI, which is controlled by ITEC, is the only entity that can assert an ADDCA claim against ITEC.

ITEC contends that *Kavanaugh* applies only to cases in which the manufacturer intentionally chooses the dealer's corporate structure to defeat the purpose of the ADDCA. Again, the Court disagrees. Though the *Kavanaugh* court found that "the [dealer's] corporate format was deliberately adopted . . . to defeat the legislative purpose of the act," it also said:

> [R]egardless of intent, the format, if given recognition, effectively insulates Ford from liability under the act. It is inconceivable that Ford, owning all the voting stock of the dealership corporation and being in complete control of it, would ever seek the protection afforded by the statute. Intention is not controlling when the fiction of corporate entity defeats a legislative purpose.

*Id.* at 717. Such is the case here. Intentional or not, the fact that ITEC chose to create a dealer-corporation rather than making Equipoise the dealer defeats the purpose of the ADDCA. To avoid that result, as *Kavanaugh* instructs, the Court deems Equipoise to be a dealer within the meaning of the statute.[1]

ITEC's second argument, that Equipoise's claim did not arise from the termination of a franchise agreement, is also flawed. The term franchise is defined by the ADDCA as "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such

---

[1] The Court is not persuaded that *Conroy Datsun Ltd. v. Nissan Motor Corp.*, 506 F. Supp. 1051 (N.D. Ill. 1980), counsels a different result. The *Conroy* court noted that a shareholder of a dealer-corporation could sue the manufacturer if the parties intended the shareholder to be a dealer and the shareholder was "essential to the operation of the dealership." *Id.* at 1055-56. Though the plaintiff in *Conroy* did not meet those requirements, Equipoise does.

agreement or contract." 15 U.S.C. § 1221(b). A franchise agreement need not be a single document. *Kavanaugh*, 353 F.2d at 715. "If other written agreements are so interwoven with the document ostensibly designated as the franchise as to affect materially the legal significance of the latter, they must be regarded as part of the franchise agreement." *Id.*[2]

As in *Kavanaugh*, the stock purchase and dealer agreements in this case are interrelated. The stock purchase agreement states that Price, as principal of Equipoise, will dedicate "one hundred percent of his efforts to [JPI's] business" and "conduct the business and affairs of [JPI] to the best of his ability," but it does not specifically enumerate his responsibilities. (*See* Compl., Ex. A, Stock Purchase Agreement at 4.) The dealer agreement, however, sets forth in detail the operation and management responsibilities Price had assumed. (*See generally* Compl., Ex. B, Dealer Sales/Maintenance Agreement.) Similarly, the dealer agreement gives ITEC three options should Price die during the agreement's term: (1) to terminate the agreement immediately; (2) to defer the termination for up to ninety days to allow Price's survivors to reorganize, sell or liquidate the dealership; or (3) to offer an interim agreement to a successor previously designated by Price who is acceptable to ITEC. (*Id.* at 19-20.) The stock purchase agreement gives ITEC another option: to seek JPI's liquidation. (*See* Compl., Ex. A, Stock Purchase Agreement at 2.) Most importantly, the stock purchase agreement explicitly ties Equipoise's right to purchase ITEC's JPI stock to the dealership's success: "The [stock] purchase [from ITEC] shall be made only from

---

[2] As ITEC points out, Equipoise alleges that the dealer agreement alone constitutes the franchise agreement. (*See* Compl. ¶ 28.) Whether that is true, however, is a question of law for the Court, not a question of fact that can be admitted by a party. RESTATEMENT (SECOND) OF CONTRACTS § 209(2) ("Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.").

7

funds received by [Equipoise] as dividends, interest or bonus from [JPI]; provided, however, that [Equipoise] has the right to purchase [ITEC's] Class A Stock with readily available funds from any source within sixty (60) days of [JPI's] audited year-end financial statement." (*Id.* at 1.) In short, like the agreements in *Kavanaugh*, the stock purchase and dealer agreements in this case are "an inseparable part of the understanding between the parties." *Kavanaugh*, 353 F.2d at 715; *see Arciniaga v. Gen. Motors Corp.*, No. 05 Civ. 6426 HB, 2005 WL 3008450, at *3 (S.D.N.Y. Nov. 10, 2005) ("Here, the Dealer Sales and Service Agreement, the Shareholders Agreement, and other documents . . . together made up the understanding between Arciniaga and GM. . . . [T]hus, all of the agreements should be viewed together to constitute a 'motor vehicle franchise contract.'"). Accordingly, the Court holds that the stock purchase agreement and the dealer agreement together constitute the franchise agreement.

ITEC's third argument, that plaintiff has failed to allege lack of good faith, is also unpersuasive. The statute defines good faith as "the duty of each party to any franchise, and all officers, employees, or agents thereof[,] to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. § 1221(e). "The duty of good faith requires that manufacturers and distributors comply with the terms of their franchise agreements in a manner not calculated to force individual dealers out of business." *Fox Motors, Inc. v. Mazda Distribs., (Gulf), Inc.*, 806 F.2d 953, 959 (10th Cir. 1986); *Nissan Motor Acceptance Corp. v. Schaumburg Nissan, Inc.*, Nos. 93 C 2701 & 92 C 6089, 1993 WL 360426, at *5 (N.D. Ill. Sept. 15, 1993) (same). Equipoise alleges that ITEC, through the JPI directors that it controlled, removed Price as president of JPI to terminate the franchise and strip Equipoise of its stock purchase rights. (Compl.

8

¶¶ 19, 21-22.) Those allegations are sufficient to support an inference of coercion. Defendants' motion to dismiss Count I is denied.

### Count III[3]

In Count III, Equipoise alleges that the ITEC directors are liable for tortious interference with contract. To state a claim for tortious interference under Illinois law, Equipoise must allege that: (1) there is a valid and enforceable contract between Equipoise and ITEC; (2) the ITEC directors knew about the contract; (3) they intentionally and unjustifiably induced ITEC to breach the contract; and (4) Equipoise was damaged as a result. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). Equipoise alleges that: the ITEC directors knew about the stock purchase agreement; Equipoise exercised its option while Price was still president of JPI; the ITEC directors refused to allow Equipoise to buy its JPI stock; they did so "to enhance their own personal ownership position and financial gain in JPI"; and their actions damaged Equipoise. (Compl. ¶¶ 20-24, 41-44.) Those allegations contain all of the elements of a tortious interference claim.

Nonetheless, the ITEC directors say this claim must be dismissed because they took the challenged actions pursuant to their privilege to direct the company's affairs. That privilege will protect the ITEC directors, however, only if their alleged inducement of ITEC's breach was done "for a proper business purpose and in good faith." *Swager v. Couri*, 395 N.E.2d 921, 927 (Ill.

---

[3]Defendants have not moved to dismiss Count II, which seeks specific performance of the stock purchase agreement.

9

1979) (quotation omitted). If they acted "without justification or maliciously," the privilege will not apply. *Id.* (quotation omitted).

Equipoise alleges that the ITEC directors' action was "unjustifiabl[e]," "wrongful" and taken to enrich themselves and JPI. (Compl. ¶¶ 43-44.) Those allegations support the inference that the directors' actions are not protected by privilege. Thus, the ITEC directors' motion to dismiss this claim on the grounds of privilege is denied.

Even if the claim is otherwise viable, nine of the eleven defendants sued as ITEC directors say that it cannot be asserted against them because they are not, in fact, ITEC directors. This argument is based on a State of Delaware 2004 Annual Franchise Tax Report, which lists as ITEC directors only two of the people that Equipoise has sued as such. (*See* Defs.' Mem. Supp. Mot. Dismiss, Ex. A.) Defendants ask the Court to take judicial notice of the report and to dismiss the claim against the nine defendants not listed on it.[4]

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). A court may not take judicial notice of a fact unless it is indisputable. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995) (holding that a Securities and Exchange Commission 10-k form could not be judicially noticed in a discrimination

---

[4] "In ruling on a 12(b)(6) motion, a district court may take judicial notice of matters of public record without converting the 12(b)(6) motion into a motion for summary judgment." *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

action to establish the number of employees in a division of the defendant's business because the form also covered two other divisions not involved in the suit).

The identities of the directors of ITEC are not "generally known." Consequently, the Court can take judicial notice of it only if the report is a source "whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). It is not. The report is a corporate tax bill, not a document that purports to identify the corporate directors, as would articles of incorporation or an annual report. Moreover, the report does not state by whom it was prepared, what information was used to prepare it or whether it was actually submitted to the State of Delaware. (*See* Defs.' Mot. Dismiss, Ex. A.) Because the report is not unquestionably accurate, it is not subject to judicial notice and cannot be used to dismiss any of the defendants from Count III.

## Count IV

Alternatively, in Count IV, Equipoise seeks to hold JPI liable for inducing ITEC to breach the stock purchase agreement by firing Price. JPI argues that this claim must be dismissed because its termination of Price did not cause ITEC to breach the agreement.

The Court agrees. Under the stock purchase agreement, ITEC's duty to sell its JPI stock to Equipoise is contingent on Price's employment with JPI. Thus, JPI's decision to terminate Price, assuming that JPI and ITEC function as separate entities, vitiated ITEC's duty to sell its stock to Equipoise. ITEC's refusal to do so after Price was terminated did not, therefore, breach any express or implied term of the agreement. Viewing JPI as ITEC's alter ego does not save the claim. If JPI is just an extension of ITEC, then Count IV is really a claim against the ITEC

directors, not JPI. In short, regardless of the relationship between JPI and ITEC, Equipoise does not have a viable tortious interference claim against JPI.

Count IV may, however, state an alternative ground for Equipoise's tortious interference claim against the ITEC directors. If Equipoise is alleging that JPI is ITEC's alter ego, then the power to decide whether Price remained president of JPI, and, thus, whether ITEC was obligated to sell its JPI stock to Equipoise, was in the hands of the ITEC directors. Under those circumstances, the directors' decision to terminate Price would be subject to the duty of good faith and fair dealing implied in the stock purchase agreement. *See Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 971 (Ill. App. Ct. 1984) (stating that duty is implied in every contract governed by Illinois law). That duty comes into play when "the contractual obligation of one party [is] contingent on a condition peculiarly within the power of that party," and requires the controlling party to "'exercise that discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443-44 (7th Cir. 1992) (quoting *Dayan*, 466 N.E.2d at 972, and holding that the duty required Baxter, whose "obligation to pay royalties [pursuant to a license agreement] did not arise unless [it] developed and sold [plaintiff's] needle . . . . to exercise reasonably its discretion in developing and marketing the . . . needle."); *see Pierce v. MacNeal Mem. Hosp. Ass'n*, 360 N.E.2d 551, 556-58 (Ill. 1977) (holding that the duty prevented defendants from escaping their obligations under a settlement agreement, which was conditioned on their receipt of an opinion from their counsel, because their counsel failed to perform the task); *Dasenbrock v. Interstate Rest. Corp.*, 287 N.E.2d 151, 154-56 (Ill. 1972) (holding that duty

required lessee to use reasonable efforts to obtain licenses and permits when the lease said no rent would be due until they were obtained).

Like the contracts in *Beraha, Dayan, Pierce* and *Dasenbrock*, the stock purchase agreement hinges Equipoise's right to purchase ITEC's JPI stock on Price's continued employment with JPI which, if it is ITEC's alter ego, is a condition that is wholly within ITEC's control. (*See* Compl. ¶¶ 30, 49-51; *id.*, Ex. A, Stock Purchase Agreement at 4.) If, as Equipoise contends, the ITEC directors had Price terminated to nullify ITEC's stock-sale obligation, that action would have breached the duty of good faith and fair dealing inherent in the stock purchase agreement, an alternative basis for Equipoise's tortious interference claim against the ITEC directors.

## Count V

In Count V, Equipoise asserts a breach of fiduciary duty claim against the JPI directors. To state such a claim under Illinois law, Equipoise must allege that a fiduciary duty exists, the duty was breached and the breach caused Equipoise's injuries. *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000). The JPI directors says they cannot be held liable for breach of fiduciary duty because JPI had "an unequivocal right to terminate Price's employment." (Mem. Supp. Mot. Dismiss at 10.) Maybe so, but if the directors exercised that right to serve themselves or any interest other than JPI's, they breached their fiduciary duties. *See Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620 (Ill. App. Ct. 1993) (stating that directors' fiduciary duties require them to "administer the corporate affairs for the common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business *solely in the interest of the corporation.*" (quotation omitted) (emphasis in original)).

13

That brings us to the directors' second argument, that Equipoise has not adequately alleged that they breached their fiduciary duties. Equipoise says that the directors breached their duties by preventing Equipoise from buying ITEC's JPI stock "to enhance the personal ownership position and financial gain of the ITEC directors." (Compl. ¶ 56.) Among others, that allegation supports the following inferences that: (1) the ITEC directors own ITEC stock; (2) ITEC's stock would be more valuable if ITEC continued to own the JPI stock; and (3) the JPI directors terminated Price, not for valid business reasons, but solely to benefit the ITEC directors financially. Those allegations and related inferences are sufficient to state a breach of fiduciary duty claim against the JPI directors.

### Plaintiff and Third-Party Defendants' Motion to Dismiss – Count II

In Count II of the counterclaim, JPI alleges that Price breached the bonus agreement. To state a claim for breach of contract, JPI must allege: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Henderson-Smith & Assocs., Inc. v. Nahamani Family Serv. Ctr., Inc.*, 752 N.E.2d 33, 43 (Ill. App. Ct. 2001). Price contends that JPI cannot allege the first element because there is no mutuality; that is, Price received no consideration from JPI for his promises.

The Court disagrees. "Consideration to support a promise may be given to a person other than the promisor if the promisor bargains for that exchange. Conversely, consideration may be given by some person other than the promisee if that is the exchange that is bargained for by the parties." *Preferred Enteral Sys., Inc. v. Central Home, Inc.*, 660 N.E.2d 174, 178 (Ill. App. Ct. 1995); *see* RESTATEMENT (SECOND) OF CONTRACTS § 71(4) (stating that consideration "may be

14

given to the promisor or to some other person" and "may be given by the promisee or by some other person"). Under the terms of the bonus agreement, Price promised to conduct the business and affairs of JPI to the best of his ability, to adhere to JPI's business management and other policies and to devote 100 percent of his time to managing JPI. (Counterclaim, Ex. B, Bonus Agreement at 1.) In return, JPI promised to make certain payments to Equipoise: "[JPI] agrees to pay Equipoise PM LLC, in addition to any salary paid to John Price, a bonus equal to Thirty-five Percent (35%) of its earnings . . . ." (*Id.* (emphasis omitted).) To the extent Price and JPI agreed to these terms, there is sufficient consideration.

The next question is whether they, in fact, agreed to those terms. Price says he signed the bonus agreement solely in his capacity as principal of Equipoise. JPI says Price intended to be bound personally. The agreement contains language that supports both interpretations. The preamble states that it is an agreement "made and entered into . . . between [JPI], the 'Dealer Company' and Equipoise PM LLC." (*Id.* (emphasis omitted).) Moreover, Price signed the agreement, but the word "Operator" appears beneath his signature, and, as noted above, he does not personally receive any of its benefits. (*Id.* at 1-2.) On the other hand, the agreement also says that "John Price, individually," agrees to, among other things, manage JPI to the best of his ability and in accordance with the policies of the JPI Board. (*Id.* at 1.) In short, it is impossible to tell from looking at the agreement, whether Price intended to be bound by it.

Under these circumstances, Price's intent becomes a question of fact:

> The agent of a disclosed principal is not personally bound by the terms of the contract which he executes in behalf of his principal unless he agrees to be personally liable. The intent to be personally bound may be express or may be inferred from all the facts. When the agent signs the document and indicates next to his signature his corporate affiliation, then absent evidence of contrary intent in

15

> the document, the agent is not personally bound. But where language in the body
> of the document conflicts with the apparent representation by the agent's signature,
> an issue of fact as to the agent's intent arises which is sufficient to withstand a
> motion to dismiss.

*Knightsbridge Realty Partners, Ltd. v. Pace*, 427 N.E.2d 815, 819 (Ill. App. Ct. 1981) (citations omitted). Price's alleged intention not to be bound by the bonus agreement is not, therefore, a basis for dismissing this claim.

Price's last argument is that the contract is unenforceable because it requires him to operate JPI "to the best of his ability," an obligation that is too vague to enforce. That provision is not, however, the one JPI alleges Price breached. Rather, JPI contends that Price breached the provision that requires him to follow the management policies set by JPI's Board. (*See* Counterclaim ¶ 21.) Because Price did not raise a vagueness argument regarding the provision that is actually at issue until his reply brief, the argument is waived. *See United States v. Turner*, 203 F.3d 1010, 1019 (7th Cir. 2000). Price's motion to dismiss Count II is denied.

## Count VI

In Count VI, JPI alleges that Equipoise, Price and Morton committed fraud by misappropriating JPI's assets. To state a fraud claim under Illinois law, JPI must allege that: (1) the movants misstated, or failed to state, a material fact; (2) they did so with the intent to deceive JPI; (3) JPI justifiably relied on the false statement or omission; and (4) JPI was injured as a result. *Lidecker v. Kendall Coll.*, 550 N.E.2d 1121, 1124 (Ill. App. Ct. 1990). In addition, a fraud claim must be pleaded with the particularity required by Rule 9(b). To plead fraud with particularity, JPI must allege who made the misstatement or omission, when and where it was made, and what

material fact was misstated or omitted. *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). Movants contend that JPI's allegations are not specific enough to pass muster under Rule 9(b).

The Court disagrees. JPI alleges that: (1) Equipoise and Price used JPI's assets on eleven different occasions between July 19, 2004 and February 16, 2005 to pay for costs incurred to develop a Maryland facility; (2) on July 14, 2004, the JPI Board had explicitly directed them not to do so; (3) Equipoise and Price concealed the payments from JPI; (4) because of Equipoise and Price's silence, JPI did not restrict their access to JPI's assets; and (5) JPI lost more than $125,000.00 as a result. (Counterclaim ¶¶ 14-15, 34; *id.*, Ex. C.) Those allegations are sufficient to state a fraud claim against Equipoise and Price under both Illinois law and Rule 9(b).

The situation is different, however, for Morton. JPI alleges that Morton is one of two owners of Equipoise and that he "was aware of or had knowledge of the unauthorized payments." (Counterclaim ¶¶ 6, 35.) The counterclaim does not otherwise describe the role, if any, Morton played in the alleged fraud. If Morton is a corporate insider, such allegations are unnecessary. *See Banowitz v. State Exch. Bank*, 600 F. Supp. 1466, 1469 (N.D. Ill. 1985) (stating that plaintiff need not plead the role of each defendant, individually, if the defendants are corporate insiders).

The fact that Morton had an ownership interest in Equipoise does not, however, support the inference that he was a corporate insider. *See In re Cady, Roberts & Co.*, SEC Release No. 34-6668, 1961 WL 60638, at *4 (Nov. 8, 1961) (stating that a corporate insider is an officer, director or controlling stockholder of a corporation, or a person whose relationship to the corporation gives him access to information that should be used "only for a corporate purpose and not for the personal benefit of anyone"). Because JPI cannot take refuge in the corporate-insider exception to

17

Rule 9(b) and has not adequately alleged that he played a role in the alleged fraud, the Count IV claim asserted against Morton must be dismissed.

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendants' motion to dismiss Counts I, III, IV and V of the complaint [doc. no. 32]. The tortious interference claim asserted against JPI in Count IV is dismissed with prejudice. In all other respects, the motion is denied. The Court also grants in part and denies in part plaintiff/counter-defendants' motion to dismiss Counts II and IV of the counterclaim and third-party complaint [doc. no. 42]. The claim in Count IV asserted against Morton is dismissed without prejudice. The motion is otherwise denied. The parties have twenty-one days from the date of this Memorandum Opinion and Order to file amended pleadings in accordance with this Order. If no amendments are filed, the claim against Morton will be dismissed with prejudice and the Court will assume that Equipoise does not wish to assert the alternate basis posited above for its tortious interference claim against the ITEC directors.

**SO ORDERED.**             **ENTERED:** JUN - 5 2006

*[signature]*

HON. RONALD A. GUZMAN
United States District Judge