IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EQUIPOISE PM LLC and JOHN PRICE,       )
                                        )
    Plaintiffs,                         )
                                        )
    v.                                  )
                                        )
INTERNATIONAL TRUCK AND ENGINE          )     No. 05 C 6008
CORP., a Delaware Corporation, K. NEAL  )
INTERNATIONAL TRUCKS f/k/a JOHN         )     Judge Ronald A. Guzmán
PRICE INTERNATIONAL TRUCK, INC.,        )
a Delaware corporation, KNEAL HOLDINGS, )
INC., a Maryland corporation, PAUL      )
KOVACH, PAUL GRZEMSKI and               )
LARRY WAKE,                             )
                                        )
    Defendants.                         )
_____)
INTERNATIONAL TRUCK AND ENGINE          )
CORP. and J. PRICE INTERNATIONAL,       )
INC. n/k/a K. NEAL INTERNATIONAL        )
TRUCKS, INC.,                           )
                                        )
    Defendants-Counterplaintiffs and    )
    Third-Party Plaintiffs,             )
                                        )
    v.                                  )
                                        )
EQUIPOISE PM LLC, JOHN PRICE            )
and KEITH MORTON,                       )
                                        )
    Plaintiff-Counterdefendant and      )
    Third-Party Defendants.             )
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiffs Equipoise PM LCC ("Equipoise") and John Price have sued International

Truck and Engine Corp. ("ITEC"), K. Neal International Trucks, which is the successor to John

Price International Truck, Inc. ("JPI"), Kneal Holdings, Inc., and Paul Kovach, Paul Grzemski and Larry Wake for their alleged violations of the Automobile Dealers Day in Court Act, 15 U.S.C. § 1221, and for specific performance, breach of contract, tortious interference with contract and breach of fiduciary duty. ITEC and JPI have countersued Equipoise, Price and Keith Morton for breach of contract, tortious interference with contract, breach of fiduciary duty, conversion and fraud. The case is before the Court on the parties' motions pursuant to Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on some or all of the claims asserted against them. For the reasons set forth below, both motions are granted in part and denied in part.

## Facts[1]

ITEC manufactures trucks and truck parts that it distributes through dealers. (Defs.' LR 56.1(a) Stmt. ¶ 3.) In 2001, Price was one of ITEC's employees and District International Trucks, Inc. was one of ITEC's dealers. (Pls.' LR 56.1(a) Stmt. ¶ 11; Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 4.)

In early 2001, Price wanted to become an ITEC dealer. (Pls.' LR 56.1(a) Stmt. ¶ 12.) Price and Morton formed Equipoise, and ITEC agreed to allow Equipoise to purchase District International Trucks, which would then be called JPI. (*Id.*)

On August 17, 2001, Equipoise and ITEC executed a Dealer Sales/Maintenance Agreement ("DSMA"). (*See* First Am. Compl., Ex. B, DSMA.) The DSMA "govern[s] the

---

[1] Unless noted otherwise, these facts are undisputed.

relation between [JPI] and [ITEC] in promoting the sale of [ITEC's products], in their purchase and sale by [JPI], and in providing warranty and other services for users." (*Id.* at 3.)

The same day, the parties' executed an agreement for the purchase of JPI's stock. (Def.'s LR 56.1(a) Stmt. ¶ 9.) Pursuant to that agreement, Equipoise purchased 5,000 of the 45,000 shares of JPI's Class B stock, which was non-voting stock. (*Id.* ¶ 10.) ITEC still retained 100 percent of JPI's voting stock. (*Id.*) The stock purchase agreement designates Equipoise as the operator of JPI. (Pls.' LR 56.1(a) Stmt. ¶ 15; Defs.' Ex. 4, Stock Purchase Agreement at 1.)

Among other things, that agreement says:

> [ITEC] hereby gives to Operator the right to purchase any number of full shares of Class A Stock of [JPI] up to 100% of the number of shares originally issued to and held by [ITEC], subject, however, to the following conditions;
>
> A. The purchase shall be made only from funds received by Operator as dividends, interest, or bonus from [JPI]; provided, however, that Operator has the right to purchase [ITEC's] Class A Stock with readily available funds from any source within sixty (60) days of the receipt of [JPI's] audited year-end financial statement. Operator may buy [ITEC's] Class A Stock at any other time upon the mutual agreement of the parties.

(Defs.' Ex. 4, Stock Purchase Agreement at 1.) It also says, however, that "[t]he rights granted Operator shall automatically expire when and if John R. Price . . . ceases, for any reason, to be President of [JPI]" and that the JPI board has "the absolute right . . . to remove [John Price] as its President at any time." (*Id.* at 2, 4.)

At about the same time, the parties entered into a bonus agreement that requires JPI to pay a bonus to Equipoise equal to thirty-five percent of JPI's audited profit at the end of each fiscal year. (Defs.' Ex. 5, Bonus Agreement at 1.) The agreement says that it is made by and between JPI and Equipoise, but it contains promises made individually by Price. (*Id.*)

3

Thereafter, Price became the president and day-to-day manager of JPI and a member of its board of directors. (Defs.' LR 56.1(a) Stmt. ¶ 15; Pls.' LR 56.1(a) Stmt. ¶¶ 16-17.) The other board members were Paul Kovach, Paul Grzemski and Larry Wake. (Pls.' LR 56.1(a) Stmt. ¶ 8.) Kovach, Grzemski and Wake were all ITEC employees and were appointed to the JPI board by ITEC. (*Id.* ¶ 9.)

When Equipoise became the operator of JPI, JPI's headquarters were located in Hyattsville, Maryland. (*Id.* ¶ 19.) In late 2003 or early 2004, the JPI board decided that JPI should move to a new facility. (*Id.* ¶ 21.) The board also decided that JPI would lease, not own, the new facility. (*Id.* ¶ 22.) Rather, a new entity owned by Price, Morton and others would be the owner of the facility and responsible for its funding. (*Id.* ¶¶ 22-23.) On July 12, 2004, the JPI board told Price that JPI would not pay for any costs associated with the new facility and directed him to reimburse JPI for any such costs it had already incurred. (Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 11.)

Nonetheless, between July 19, 2004 and February 16, 2005, plaintiffs caused JPI to pay more than $128,000.00 for development of the new facility. (*Id.* ¶ 13.) Plaintiffs say that money was a loan to Equipoise from JPI that Equipoise was planning to pay back once it received its final funding for the project. (Pls.' LR 56.1(a) Stmt. ¶¶ 24-25.) There is, however, no written documentation for the loan or evidence that the JPI board took any action with respect to it. (Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 18-19.)

Another ITEC dealer, the Prince Frederick Motor Company, was located near JPI. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 11.) In 2004, after the owner of Prince Frederick died, Price began hiring that dealer's employees and negotiating with the deceased owner's daughter to purchase its market. (*Id.* ¶¶ 11, 13.) Though ITEC knew about those negotiations, it sent an ITEC

4

employee, Steve Mroczkowski, to negotiate for the purchase without Price's knowledge. (*Id.* ¶ 13.) Ultimately, Mroczkowski closed the deal, and ITEC forced JPI to fund the purchase. (*Id.* ¶ 14.)

Shortly thereafter, on February 8, 2005, Morton, the other member of Equipoise, sent an email to Dennis Wise, ITEC's Vice President of Dealer Operations, protesting the Prince Frederick deal:

> The purpose of this message is to request a meeting with you. I'm confused as to what happened the last few weeks and I'd like you to clear it up for both John and I. Somehow, it was ordained that about $300,000 should be added to the price of our dealership. This was done without discussion or board meeting and in a great hurry. This might be a very good thing to do. Maybe it was necessary for us to take a bullet for the team. Maybe there is a cause so great that it makes sense to do this. Could that number have been $500,000 or more? Who decides? Will it happen again? I'm sure you can understand my concern. Maybe we should accelerate getting out of [ITEC's] Dealcorps.

(*Id.* ¶¶ 2, 18; *id.*, Ex. O, Email to Wise from Morton of 2/8/05.) Wise forwarded the email to Kovach, Mroczkowski, and John Whitnell, who later succeeded Wise as Vice President of Dealer Operations, with a message saying "[C]oming to grips with J. Price is a top priority." (*Id.*, Ex. P, Email to Kovach, Mroczkowski and Whitnell from Wise of 2/8/05.)

On February 24, 2005, Whitnell sent an email to Wise, Grzemski and others, saying: "We are going to effect a change in the leadership of [JPI] on 3/1/2005." (*Id.*, Ex. Q, Email to Wise, Grzemski, Jarrick, Martinicky and Serrano from Whitnell of 2/24/05.)

Between February 24 and 28, 2005, Whitnell, Wake and others prepared a special report to the JPI board setting forth the grounds for terminating Price. (Defs.' LR 56.1(a) Stmt. ¶ 28; *see* Defs.' Ex. 12, 3/1/05 Special Report.)

On February 25, 2005, Wake told Price to send out a notice for a special JPI board meeting to be held on March 1, 2005. (Pls.' LR 56.1(a) Stmt. ¶ 27.) Wake did not tell Price,

however, that Price's termination was on the agenda for that meeting. (*Id.*) The same day, Price contacted a lawyer, Don Hershman, and expressed his concern that the JPI board was about to remove him as president. (Defs.' LR 56.1(a) Stmt. ¶ 35.)

At 4:59 p.m. on February 28, 2005, Hershman faxed a letter to "Board of Directors, J. Price International Truck, Inc." (Def.'s Ex. 21, Fax to Board of Directors from Hershman of 2/28/05.) In relevant part, the letter states:

> Please be advised that pursuant to the terms of that certain Stock Purchase Agreement entered into on August 27, 2001 between [ITEC] and Equipoise, Equipoise is exercising its rights under Article I to acquire all of the shares of the Class A stock and the Class C stock of [JPI].
>
> Please advise us as to the names of the appropriate parties who will be negotiating on behalf of [ITEC] so that the acquisition may be consummated as expeditiously as possible.

(*Id.*) However, Hershman faxed the letter to JPI's office in Maryland, not to the ITEC headquarters in Illinois, where board members Kovach, Grzemski and Wake worked. (Defs.' LR 56.1(a) Stmt. ¶ 39.) When Hershman sent the letter, Equipoise had not yet received JPI's audited year-end financial statement. (*Id.* ¶ 41.)

At the meeting on March 1, 2005, the JPI board removed Price as its president and refused to honor Equipoise's stock purchase request. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 28, 38.) Kovach, Grzemski and Wake knew about the letter from Hershman when they made those decisions. (*Id.* ¶¶ 34, 38.)

## Discussion

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there

6

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## Defendants' Motion – Count I

In Count I of their complaint, plaintiffs assert a claim against ITEC for violation of the Automobile Dealer Day in Court Act ("ADDCA"). In relevant part, that statute provides:

> An automobile dealer may bring suit against any automobile manufacturer . . . and shall recover the damages by him sustained . . . by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer. . . .

15 U.S.C. § 1222. Plaintiffs allege that ITEC violated the ADDCA by sabotaging Equipoise's contractual right to buy JPI's stock by forcing Equipoise to accept an unreasonably high purchase price for JPI, coercing it into approving the purchase of Prince Frederick, refusing to give it the audited year-end financial statement for 2004, and removing Price as JPI's president. (First Am. Compl. ¶¶ 34-37.)

Though plaintiffs have no evidence to suggest that the price ITEC forced Equipoise to accept for JPI was unreasonably high, viewed favorably to them, the record does show that: (1) ITEC refused to give Price the audited financial statement for 2004 (*see* Defs.' Ex. 13, Price

7

Dep. at 114-17); and (2) ITEC forced JPI to purchase Prince Frederick, thereby increasing JPI's book value and the buy-out price of its stock (*see* Pls.' LR 56.1(b)(3)(C) ¶ 14).[2] What plaintiffs lack, however, are facts that suggest ITEC took those actions for the purpose of destroying Equipoise's buyout rights. There is no evidence, for example, that ITEC sent JPI an audited financial statement every year but 2004 or that the Prince Frederick purchase added no value to JPI. On the contrary, plaintiffs admit that JPI received an audited financial statement for only one of the four years that Price was its president and Price himself had been negotiating to purchase Prince Frederick's market before ITEC sealed the deal. (*Id.* ¶ 13; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 48.) Absent evidence that suggests ITEC's alleged actions were intended to eliminate Equipoise's stock purchase rights, they do not support an ADDCA claim.

That leaves the undisputed fact of Price's termination. But, because Price was terminated by JPI, not ITEC, his termination will support an ADDCA claim against ITEC only if ITEC controlled JPI. Viewed favorably to plaintiffs, the record supports that contention. It is undisputed that ITEC chose the four members of JPI's board, Price, Kovach, Grzemski and Wake, the last three of whom are ITEC employees. (Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 1.) Kovach reports to the Vice President of Dealer Operations, a job that was held first by Wise and then by Whitnell during the events giving rise to this suit. (*Id.* ¶ 2.) Moreover, Kovach testified that he "naturally went along" with what his boss, *i.e.*, Wise or Whitnell, wanted with respect to JPI, even if he disagreed with the proposed action. (*See* Defs.' Ex. 8, Kovach Dep. at 54-55.) Grzemski and Wake report to Kovach. (Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 3.)

---

[2]Defendants denied the facts asserted in this paragraph, citing pages 119-24 of Wake's deposition. (*See* Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 14.) Those pages do not, however, support the denial. Thus, defendants are deemed to have admitted this statement. *See* Local Rule 56.1.

8

Further, Kovach, Grzemski and Wake each testified that he did not make the decision to terminate Price. (Defs.' Ex. 8, Kovach Dep. at 40-41; *id.*, Ex. 9, Wake Dep. at 62-63; *id.*, Ex. 10, Grzemski Dep. at 38-40.) Rather, Kovach was told by Whitnell, Wake was told by Kovach, and Grzemski read about it in an email from Whitnell. (*Id.*) Similarly, Wise says Whitnell was the person who "first made the recommendation or suggestion that John Price . . . be terminated" and "took the lead" in making it happen. (*Id.*, Ex. 11, Wise Dep. at 101.) There is no dispute that Whitnell sent the February 24, 2005 email to Wise, Grzemski and others that said: "We are going to effect a change in the leadership of [JPI] on 3/1/05." (Pls.' LR 56.1(b)(3)(C) Stmt., Ex. Q, Email to Wise, Grzemski, Jarrick, Martinicky and Serrano from Whitnell of 2/24/05; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 21.) Nor is it disputed that Whitnell was one of the drafters of the special report on Price that was presented to the JPI board on March 1, 2005. (Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 28.) Taken together, these facts are sufficient to raise a genuine issue as to whether Price's termination was ITEC's decision rather than an independent decision of the JPI board.

Even if ITEC did cause JPI to terminate Price, defendants claim that the termination did not violate the ADDCA because the parties' agreement gave JPI the right to terminate Price "at any time." (*See* Defs.' Ex. 4, Stock Purchase Agreement at 4.) Because that right was unconditional, defendants say JPI could not have exercised it in bad faith, even if the reasons it gave for doing so were not the real reasons for its decision.

In support of that argument, defendants cite *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000). The plaintiff in *Tuf* was a motorcycle dealer that sued Suzuki under the Illinois counter-part to the ADDCA for its bad-faith termination of plaintiff's dealership. *Id.* at 588-89. Suzuki said it terminated the dealership because plaintiff

9

had violated the agreement in a variety of ways. *Id.* at 598. Tuf contended that Suzuki engineered one of the alleged breaches but admitted that it had independently violated the agreement in other ways. *See Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, No. 94 C 50392, 1997 WL 811021, at *1-3 (N.D. Ill. Dec. 29, 1997). Tuf claimed, however, that none of the reasons Suzuki gave were the real reasons for the termination, and that Suzuki's dishonesty violated the state statute. *Tuf*, 223 F.3d at 589.

The Seventh Circuit disagreed:

> Tuf appears to think that the [statute] entitles it to complain about a pretextual termination even if there is good cause for termination. This is incorrect. The . . . fact that there is a duty of good faith read into every contract does not justify judicial inquiry into motive. A party can stand on his contract rights; what he cannot do is resort to opportunistic or otherwise improper behavior in an effort to worm his way out of his contractual obligations.

*Id.*

In this case, unlike *Tuf*, plaintiffs do not contend that ITEC lied about its reason for barring Equipoise from exercising the stock option, *i.e.*, that Price was no longer president of JPI. Rather, plaintiffs argue and have offered evidence that ITEC caused JPI to terminate Price so ITEC would not have to honor its promise to sell Equipoise the stock. (*See* Pls.' LR 56.1(b)(3)(C) Stmt., Ex. O, Email to Wise from Morton of 2/8/05 (questioning the Prince Frederick deal and saying "[m]aybe we should accelerate getting out of [ITEC's] Dealcorps"); *id.*, Ex. P, Email to Kovach, Mroczkowski and Whitnell from Wise of 2/8/05 ("[C]oming to grips with J. Price is a top priority."); *id.*, (Ex. Q, Email to Wise, Grzemski, Jarrick, Martinicky and Serrano from Whitnell of 2/24/05) ("We are going to effect a change in the leadership of [JPI] on 3/1/05."); Pls.' LR 56.1(b)(3)(B) Stmt. ¶¶ 48, 38 (stating that Price was removed as JPI president on March 1, 2005).) If that is true, and for the purposes of this motion we must assume

10

that it is, then ITEC acted in bad faith and breached the ADDCA. *See Tuf*, 223 F.3d at 589 (stating that there is no distinction between the statutory duty of good faith and the common law duty); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443-44 (7th Cir. 1992) (saying the common law duty comes into play when "the contractual obligation of one party [is] contingent on a condition peculiarly within the power of that party," and requires the controlling party to "'exercise that discretion reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" (quoting *Dayan v. McDonald's Corp.*, 466 N.E.2d 958, 972 (Ill. App. Ct. 1984))); *Dasenbrock v. Interstate Rest. Corp.*, 287 N.E.2d 151, 154-56 (Ill. 1972) (holding that duty required lessee to use reasonable efforts to obtain licenses and permits when the lease said no rent would be due until they were obtained). Defendants' motion for summary judgment on Count I is, therefore, denied.

**Counts II-IV - Contract Claims**

In Count II plaintiffs allege a claim for specific performance of the stock purchase agreement, in Count III they allege breach of contract, and in Count IV they allege that ITEC breached its duty of good faith and fair dealing. Specific performance is really a remedy not a claim. *See Abrams v. Rapoport*, 516 N.E.2d 943, 946 (Ill. App. Ct. 1987) ("It is well settled that specific performance is an extraordinary remedy . . . ."). And the covenant of good faith and fair dealing is not an "independent source of [contractual] duties" but a "guide[] [to] the construction of explicit terms in an agreement." *Beraha*, 956 F.2d at 1443. Thus, these three counts, in reality, state a single claim for breach of contract.

This claim is premised on ITEC's failure to sell JPI's stock to Equipoise. The stock purchase agreement gives Equipoise the right to buy ITEC's JPI stock while Price is president of

11

JPI and if the purchase is made with "funds received by [Equipoise] as dividends, interest or bonus from [JPI]" or "readily available funds from any source within sixty (60) days of the receipt of [JPI's] audited year-end financial statement." (Defs.' Ex. 4, Stock Purchase Agreement at 1, 4.) Plaintiffs say that Equipoise exercised that right in the letter it sent to the JPI directors on February 28, 2005. (*See* Def.'s Ex. 21, Fax to Board of Directors from Hershman of 2/28/05.)

The stock purchase agreement does not say how or to whom Equipoise should communicate its decision to purchase ITEC's JPI stock. As the Court previously ruled, however, the stock purchase agreement and the DSMA must be read together. *See Equipoise PM LLC v. Int'l Truck & Engine Corp.*, No. 05 C 6008, 2006 WL 1594077, at \*2-3 (N.D. Ill. June 5, 2006). The DSMA instructs JPI to communicate its intent to terminate the agreement by mailing a notice of termination to ITEC's Central Dealer Administration, 4201 Winfield Road, Warrenville, Illinois 60555. (First Am. Compl. Ex. B, DSMA at 2, 16.) JPI's decision to terminate the DSMA and Equipoise's decision to purchase JPI's stock both fundamentally alter the relationship between Equipoise and ITEC. Thus, it is reasonable to interpret the stock purchase provision as having the same notice requirement as the DSMA termination provision.

It is undisputed that Equipoise faxed and mailed the February 28, 2005 letter to JPI's headquarters at 5000 Tuxedo Road, Tuxedo, Maryland 20781, not to ITEC in Illinois. (*See* Def.'s Ex. 21, fax to Board of Directors from Hershman of 2/28/05.) However, it also emailed the letter to Denny Wise, ITEC's Vice President of Dealer Operations. (*See* Def.'s Ex. 21, Fax to Board of Directors from Hershman of 2/28/05; Pls.' LR 56.1(b)(3)(C) Stmt ¶¶ 2, 18.) Moreover, though the DSMA does not identify the employees of ITEC's Central Dealer Administration, it is reasonable to assume that the Vice President of Dealer Operations is one of

12

them. (*See* First Am. Compl., Ex. B, DSMA at 2 (stating that Central Dealer Administration "refers to [ITEC's] office responsible for the implementation and administration of the [DSMA]").) In short, plaintiffs have created a genuine issue for trial as to whether Equipoise properly notified ITEC of its intent to purchase JPI's stock.

The next question is whether the parties' agreement requires Price to be JPI's president when Equipoise announces its intention to buy ITEC's stock or when the purchase is actually consummated. The agreement is silent on this point. It simply says that "[t]he rights granted [to Equipoise to buy ITEC's JPI stock] shall automatically expire when and if John R. Price . . . ceases, for any reason, to be President of [JPI]." (Defs.' Ex. 4, Stock Purchase Agreement at 4.)

Plaintiffs contend that it is unreasonable to interpret the agreement as requiring Price to be JPI's president when the stock purchase is completed. That interpretation, plaintiffs say, allows ITEC to nullify Equipoise's stock option by terminating Price as soon as Equipoise announces its intention to buy, rendering illusory ITEC's promise to sell.

The Court disagrees. An illusory promise is one in which "the promisor has not [actually] promised to do anything" or "[his] performance is optional." *W.E. Erickson Constr., Inc. v. Chi. Title Ins. Co.*, 641 N.E.2d 861, 864 (Ill. App. Ct. 1994). The fact that the condition on which a promise depends might not occur does not, however, make the promise illusory. *See Charles Hester Enters., Inc. v. Ill. Founders Ins. Co.*, 499 N.E.2d 1319, 1323 (Ill. 1986) ("If a seeming promise is made conditional upon an event that cannot occur at all . . . , no real promise has been made. . . . If, on the other hand, the promise is conditional upon an event that may possibly occur, it is not illusory; and it is not made an insufficient consideration by the fact that the probability that the event will occur is very slight." (quotation omitted)). Consequently, the

13

fact that Price might not be president of JPI when Equipoise sought to purchase the stock, the condition on which ITEC's obligation to sell it hinged, does not make ITEC's promise illusory.

Nor does the fact that ITEC controls that condition. The duty of good faith and fair dealing prohibits ITEC from terminating Price to evade its stock sale obligation. *See Dasenbrock*, 287 N.E.2d at 155. That duty means ITEC's performance is not optional and its promise is not illusory:

> A promise conditioned upon an event within the promisor's control is not illusory if the promisor also impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred. The implied promise is enforceable by the promisee, and it constitutes a legal detriment to the promisor; therefore it furnishes sufficient consideration to support a return promise.

*Foster Enters., Inc. v. Germania Fed. Sav. & Loan Ass'n*, 421 N.E.2d 1375, 1381 (Ill. App. Ct. 1981) (quotations and citations omitted). In short, it is not unreasonable to interpret the agreement as requiring Price to be JPI's president when the stock sale is completed.

The same cannot be said for the interpretation plaintiffs urge. It is clear from the parties' agreement that they intended the contract to preserve ITEC's right to choose a successor dealer if the parties' agreement terminated or the membership of Equipoise changed. (*See* First Am. Compl., Ex. B, DSMA at 19 (stating that it is "a personal agreement" that will automatically terminate upon the death or incapacity of Morton or Price or a change in Equipoise's membership); *id.* at 19-20 (giving ITEC the power to approve any successor designated by Equipoise); *id.* at 22 ("This is a personal agreement, involving mutual confidence and trust, and it may not be assigned by either party without the written consent of the other party . . . ."); Defs.' Ex. 4, Stock Purchase Agreement at 2 (giving ITEC the option to buy Equipoise's JPI stock or liquidate JPI if Price dies or ceases to be JPI's president); *id.* at 3 (stating that Equipoise

14

will offer its stock to ITEC before selling or transferring to anyone else).) Plaintiffs' interpretation would require ITEC to turn over its JPI stock to Equipoise even if, at the time the transaction was completed, Price was dead or incapacitated, had divested himself of his interest in Equipoise or had otherwise become unable or unwilling to operate JPI, as long as Price had been JPI's president when Equipoise decided to buy the stock. In other words, plaintiffs' interpretation would frustrate the parties' stated intent to allow ITEC to choose its dealer. The Court, therefore, holds that the parties' agreement unambiguously requires Price to be president of JPI when the stock transaction is completed.

Given that interpretation, defendants say the record establishes that ITEC did not breach the agreement because it is undisputed that the stock transaction was not consummated the day Price was terminated. (*See* Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 28, 38.) As noted above, however, the duty of good faith and fair dealing prohibits ITEC from exercising its discretion to fire Price to avoid its stock sale obligation. *See, e.g., Beraha,* 956 F.2d at 1443-44 (saying that the duty of good faith requires a party who controls the condition on which its contractual obligation depend to act "reasonably and with proper motive, . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." (quotation omitted)). Moreover, as discussed above, plaintiffs have offered evidence that suggests ITEC did just that. (*See supra* at 10-11.) If that is true, then ITEC breached the contract. Defendants' motion for summary judgment on Counts II-IV is, therefore, denied.

## Count V – Conspiracy to Induce Breach

In Count V, plaintiffs allege that ITEC and JPI are liable for conspiring to breach the stock purchase agreement. "Civil conspiracy consists of a combination of two or more persons

15

for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). Though there is a genuine issue as to whether ITEC breached the contract, it did so only if the JPI directors were acting as its agents. (*See supra* at 8-9.) "The acts of an agent are considered . . . to be the acts of the principal." *Salaymeh v. InterQual, Inc.*, 508 N.E.2d 1155, 1158 (Ill. App. Ct. 1987). Consequently, "a conspiracy [can]not exist between a principal and an agent or servant." *Id.* Therefore, the Court grants defendants' motion for summary judgment on Count V.

## Count VI – Breach of Fiduciary Duty

In Count VI, Equipoise asserts a breach of fiduciary duty claim against Grzemski, Kovach and Wake. Corporate directors have the duty to "administer the corporate affairs for the common benefit of all the stockholders and exercise their best care, skill and judgment in the management of the corporate business *solely in the interest of the corporation.*" *Stamp v. Touche Ross & Co.*, 636 N.E.2d 616, 620 (Ill. App. Ct. 1993) (quotation omitted). Directors breach that duty if they put the interests of the controlling shareholder before those shared by all stockholders generally. *Shaper v. Bryan*, 864 N.E.2d 876, 884-85 (Ill. App. Ct. 2007) (Delaware law). Plaintiffs have offered evidence that Kovach, Grzemski and Wake: (1) are employed, and were appointed to the JPI board, by ITEC; (2) report directly or indirectly to Whitnell; (3) did not make the decision to terminate Price; and (4) heard about the decision directly or indirectly from Whitnell. (Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 1-3; Defs.' Ex. 8, Kovach Dep. at 40-41, 54-55; *id.*, Ex. 9, Wake Dep. at 62-63; *id.*, Ex. 10, Grzemski Dep. at 38-40.) Moreover, there is evidence that Kovach, who reported directly to Whitnell and to whom Grzemski and Wake reported, did Whitnell's bidding with respect to JPI even if he disagreed with the proposed

16

action. (Defs.' Ex. 8, Kovach Dep. at 54-55.) Taken together, these facts are sufficient to raise a genuine issue as to whether Kovach, Grzemski and Wake put ITEC's interest in terminating Price above the interests of JPI.

## Count VII – Tortious Interference

In Count VII, plaintiffs allege that ITEC tortiously interfered with Price's employment relationship with JPI. To defeat defendants' motion on this claim, plaintiffs must offer evidence that Price had a reasonable expectation of entering into a valid business relationship with JPI, ITEC knew about it, ITEC's deliberate interference prevented the expectancy from ripening into a relationship, and Price was damaged as a result. *Larry Karchmar, Ltd. v. Nevoral*, 707 N.E.2d 223, 228 (Ill. App. Ct. 1999) (setting forth claim elements and stating that "[a]n action for tortious interference with a contract terminable at will is classified as one for intentional interference with prospective economic advantage"). As discussed above, the record either establishes or suggests that ITEC knew Price was JPI's president, ITEC caused JPI to sever that relationship, and Price was damaged as a result. Defendants' motion for summary judgment on Count VII is, therefore, denied.

## Plaintiffs' Motion

Plaintiffs seek summary judgment on Counts II, III, V and VI of the counterclaim, all of which seek to impose liability on Price and/or Morton, individually. Plaintiffs say that they are shielded from liability by the Delaware Limited Liability Company ("LLC") Act, which provides:

17

(a) [T]he debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

(b) Notwithstanding the provisions of subsection (a) . . . , a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.

Del. Code Ann. tit. 6, § 18-303.

As its plain language suggests, this provision will shield Price and Morton from liability if the only basis defendants have for the claims against them is their membership in Equipoise. If, however, defendants prove that Price or Morton assumed liability, or committed, authorized or ratified tortious acts while acting for Equipoise, then this provision provides them no protection. *See Pepsi-Cola Bottling Co. of Salisbury, Md. v. Handy*, No. 1973-S, 2000 WL 364199, at *3 (Del. Ch. Mar. 15, 2000) ("Section 18-303(a) protects members and managers of an LLC against liability for any obligations of the LLC solely by reason of being or acting as LLC members or managers. But, [the] phrase, 'solely by reason of being a member. . .' . . . impl[ies] that there are situations where LLC members . . . would not be shielded by this provision."); *see also Weber v. U.S. Sterling Sec., Inc.*, ___ A.2d___, No. 17623, 2007 WL 1703469, at *4 (Conn. June 19, 2007) ("[T]he statute plainly provides that a limited liability company member cannot be held liable for the malfeasance of a limited liability company by virtue of his membership in the limited liability company alone; . . . . [But it] does not preclude individual liability for members . . . if that liability is not based simply on the member's affiliation with the company."); 2 R. FRANKLIN BALOTTI, JESSE A. FINKELSTEIN, MARTIN I. LUBAROFF & PAUL M. ALTMAN, BALOTTI AND FINKELSTEIN'S DELAWARE LAW OF

18

CORPORATIONS AND BUSINESS ORGANIZATIONS § 20.7 (2007) ("The word 'solely,' which is used in Section 18-303, indicates that a member or manager will not be liable for the debts, obligations, or liabilities of a Delaware LLC only by reason of being a member or manager; however, other acts or events could result in the imposition of liability upon . . . a member . . . . [such as] tortious conduct by the member . . . ."); PRACTICING LAW INSTITUTE, ORGANIZATION AND OPERATION OF THE LIMITED LIABILITY COMPANY: SUBSTANTIVE ISSUES 937 PLI/Corp. 149, 191 (1996) ("The 'solely by reason of' phrase is to make clear that, while members do not have the vicarious liability of partners, they are responsible for their own acts or omissions and for obligations undertaken by agreement . . . .").

In Count II, defendants assert that Price agreed to be bound personally by the bonus agreement and thereafter breached it. In Count III, defendants allege that Price and Morton caused Equipoise, and Morton caused Price, to breach the stock purchase and bonus agreements, respectively, by deviating from ITEC's management policies. In Counts V and VI, defendants allege that Price and/or Morton are liable for conversion or fraud for causing Equipoise to use JPI's funds to pay for development of the new facility. In short, defendants seek to hold Price and Morton liable on these claims either because they assumed liability or they personally committed or authorized tortious acts in Equipoise's name. Thus, for the reasons discussed above, if defendants have evidence to support their allegations, section 18-303 will not shield Price and Morton from liability.

## **Count II – Breach of Contract**

In Count II of the counterclaim, ITEC alleges that Price is liable for breaching the bonus agreement, which he signed in his personal capacity. Price says that ITEC, who is not a

signatory to the agreement, has no standing to pursue this claim. As noted above, however, a reasonable inference supported by the record is that ITEC controlled JPI. If that is true, and for the moment we must assume that it is, ITEC has standing to sue.

Price also says he is entitled to judgment on this claim because he signed the bonus agreement solely in his capacity as principal of Equipoise. As the Court noted in its Order denying plaintiffs' motion to dismiss this claim, the agreement contains language that supports both interpretations, making the issue one of fact. *See Equipoise*, 2006 WL 1594077, at *2-4. Plaintiffs say the record conclusively resolves this fact issue in their favor.

The Court disagrees. Viewed favorably to defendants, as it must be on plaintiffs' motion, the record shows that: (1) Price agreed, individually, to manage JPI to the best of his ability and in accordance with the policies of the JPI Board (Defs.' Ex. 5, Bonus Agreement at 1); (2) Price did not indicate that he signed the agreement solely on behalf of Equipoise (*id.* at 2); (3) the ITEC employees who helped to establish JPI as a dealership regarded Price as the operator (Defs.' Ex. 10, Grzemski Dep. at 25-28; Defs.' Ex. 11, Wise Dep. at 19-20); and (4) Equipoise was not formed until after the bonus agreement was signed (*compare* Defs.' Ex. 5, Bonus Agreement at 1 (dated 8/1/01), *with* Pls.' Ex. 2, Certificate of Formation (dated 8/14/01).) Taken together, those facts raise a genuine issue for trial as to whether Price signed the Bonus Agreement in his individual capacity.

Even if Price is personally bound by the agreement, plaintiffs argue that he is still entitled to judgment because the record shows that ITEC waived any breach of the agreement. Illinois law defines a waiver as "an express or implied voluntary and intentional relinquishment of a known and existing right." *Whalen v. K-Mart Corp.*, 519 N.E.2d 991, 994 (Ill. App. Ct. 1988). A waiver analysis "focuses on the intent of the non-breaching party." *Id.* "If he has

20

intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." *Id.*

If he agreed to be personally bound, Price says, the consideration for his promise to follow JPI's policies was its agreement to pay a bonus to Equipoise. Thus, Price argues, JPI's agreement to pay that bonus for 2004 and the first two months of 2005 demonstrates that JPI did not intend to hold Price to his promise.

Once again, the Court disagrees. The record shows that JPI decided to pay Equipoise a bonus for 2004 and part of 2005 *after* Price was terminated, (*see* Pls.' Ex. 20, Email to Kovach from Grzemksi of 3/7/05), a payment specifically contemplated by the agreement:

> If this Agreement is terminated, the bonus provided in Paragraph 3 above shall be immediately and wholly voided . . . provided, however, that the Board of Directors of [JPI] may in its discretion grant Operator such portion of such bonus for said year or period and on such terms and conditions as it may feel are justified.

(Defs.' Ex. 5, Bonus Agreement at 2.) Because the board did not agree to pay the bonuses until after Price was terminated and the agreement gave it discretion to do so, its decision to pay the bonuses does not conclusively establish waiver.

## Count III – Tortious Interference

In Count III of their counterclaim, defendants allege that Morton and Price induced Equipoise, and Morton induced Price, to breach their respective obligations under the stock purchase and bonus agreements to adhere to JPI's policies. Plaintiffs substantively address only the latter claim. Thus, their motion for summary judgment on the former, the tortious interference claim leveled against both Morton and Price, is denied.

21

To defeat plaintiffs' motion with respect to the claim asserted against Morton alone, defendants must offer evidence that: (1) there is a valid and enforceable contract between JPI and Price; (2) Morton knew about it and intentionally and unjustifiably induced Price to breach it; and (3) JPI was damaged as a result. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). As discussed above, defendants have offered evidence to support the first element, and plaintiffs do not argue that evidence of the second and fourth elements is lacking. They contend, however, that the record contains no evidence of element two, that Morton induced Price to breach.

The Court agrees. The breach Morton is alleged to have induced is Price's disregard of the JPI board's directive not to use JPI's money to fund development of the new facility. Defendants have offered no evidence to suggest that Morton knew Price had been instructed not to use JPI's money for the new facility, let alone encouraged him to disregard that directive. In fact, it is undisputed that Price managed the day-to-day affairs of JPI, and that Morton knew neither that Equipoise used JPI's money to fund development of the new facility or that the JPI board had told Price not to do so. (Defs.' LR 56.1(b)(3)(B) Stmt. ¶¶ 17-18, 27; Defs.' Ex. 22, Morton Dep. at 57.) Given those facts, Morton is entitled to judgment as a matter of law on the claim that he induced Price to breach the bonus agreement.

## Count V – Conversion

In Count V of their counterclaim, defendants allege that Equipoise and Price are liable for converting JPI's money to their own use in developing the new facility. To prevail on a claim for conversion, defendants must show that they have a right to immediate possession of property, have made a demand for it, and defendants are wrongfully controlling it. *IOS Capital,*

22

*Inc. v. Phoenix Printing, Inc.*, 808 N.E.2d 606, 610 (Ill. App. Ct. 2004). "Money may be the subject of conversion, but it must be capable of being described as a specific chattel . . . ." *In re Thebus*, 483 N.E.2d 1258, 1260-61 (Ill. 1985). Thus, a claim for conversion will lie for money only if the plaintiff alleges "that it has a right to a specific, identifiable amount of money; a claim of right to an indeterminate sum of money sounds in debt rather than in conversion. *3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 940 (N.D. Ill. 2000). Plaintiffs contend that the conversion claim fails as a matter of law because: (1) the money Equipoise allegedly converted was not identifiable as belonging to JPI; and (2) even if it were, the money constitutes a debt.

The requirement that money be identifiable stems from *Thebus*. The respondent in that case had been charged with conversion by the Attorney Registration and Disciplinary Commission ("ARDC") for his failure to turn over to the IRS funds he withheld from his employees' wages for taxes. 583 N.E.2d at 1259. The Illinois Supreme Court held that the withheld amounts did not constitute an identifiable fund because:

> The respondent . . . did not maintain a separate bank account in which the taxes withheld and owed to the Internal Revenue Service were deposited. Likewise, he did not maintain a separate payroll account. . . . The money owed to the government did not come into respondent's hands from any outside source. It was an amount that accrued with each pay period as the respondent wrote the payroll checks from his general checking account for the net amount of wages after taxes, retaining in his checking account the difference between the gross wages and the amount of the check.

*Id.* at 1262; *see Sutherland v. O'Malley*, 882 F.2d 1196, 1200-01 (7th Cir. 1989) (affirming dismissal of conversion claim brought by attorney for fees generated in connection with a settlement because plaintiff was entitled to fees on a *quantum meruit* basis, making her claim one for an indeterminate sum); *3com Corp.*, 104 F. Supp. 2d at 940 (dismissing conversion claim

23

based on defendant's alleged under-reporting of the amount of plaintiff's scrap it sold to third parties because defendant sold scrap from a number of companies in the relevant period and plaintiff could not identify precisely the sum of money it was owed); *Sandy Creek Condo. Ass'n v. Stolt & Egner, Inc.*, 642 N.E.2d 171, 175 (Ill. App. Ct. 1994) (dismissing conversion claim for money misappropriated from condominium association by its manager because evidence that "the defendants failed to collect assessments on the garages, overcharged for maintenance, and failed to pay rent for use of the laundry facility" was "speculative" and did not show that "defendants exercised control over a specific and identifiable sum of money belonging to plaintiff"); *Mid-Am. Fire & Marine Ins. Co. v. Middleton*, 468 N.E.2d 1335, 1338-39 (Ill. App. Ct. 1984) (rejecting claim for conversion because plaintiff's right to reimbursement from a settlement "was to be reduced by plaintiff's 'proportionate share of all reasonable costs incurred in effecting said recovery,'" which gave her the right to an indeterminate sum not a specific fund).

In this case, unlike in *Thebus* and its progeny, defendants seeks to recover a determinate sum of money, $128,550.84, that plaintiffs took from an outside source, JPI, and used for their own purposes. (*See* Pls.' Resp. Defs.' LR 56.1(b)(3)(C) Stmt. ¶ 13.) That money is sufficiently identifiable to support a conversion claim. *See LFG, LLC. v. Navarre*, No. 01 C 9451, 2002 WL 1379112, at *3 (N.D. Ill. June 26, 2002) ("[*Thebus's*] requirement that the money be capable of being described as a specific chattel is satisfied in this case by LFG's specific identification of the funds that were allegedly converted as a specific amount of money that belonged to LFG." (quotation omitted)); *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 806 N.E.2d 280, 285-87 (Ill. App. Ct. 2004) (upholding conversion claim for unpaid sales

commissions and saying that "[a]n action for conversion may . . . be maintained where the converted funds are capable of being described, identified, or segregated in a specific manner.")

Even if the money is identifiable, plaintiffs say it constitutes a debt owed by them to JPI, which cannot be the subject of a conversion claim. *See Thebus*, 483 N.E.2d at 1261. Again, the Court disagrees. "[A] debtor-creditor relationship is created when a party (creditor) transfers his property voluntarily to another (debtor)." *Roderick Dev. Inv. Co., Inc. v. Comty. Bank of Edgewater*, 668 N.E.2d 1129, 1135 (Ill. App. Ct. 1996). Plaintiffs say that is what happened in this instance because JPI loaned the money to Equipoise. (*See* Pls.' LR 56.1(a) Stmt. ¶¶ 24-25.) Defendants, however, citing the lack of documentation and board approval for it, deny that any loan was made. (*See* Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 18-19.) Because the record reveals a genuine issue of fact as to whether the JPI voluntarily transferred money to plaintiffs, plaintiff's motion for summary judgment on the conversion claim is denied.

## Count VI - Fraud

In Count VI, JPI alleges that Equipoise, Price and Morton committed fraud by misappropriating JPI's assets. Morton contends that there is no evidence to support this claim against him. *See Lidecker v. Kendall Coll.*, 550 N.E.2d 1121, 1124 (Ill. App. Ct. 1990) (listing claim elements as intentional misstatement or omission of material fact, defendants' justifiable relied on it and consequent injury). The Court agrees. The gist of the fraud claim against Morton is that he knew about and acquiesced to Equipoise's use of JPI's money and the concealment of that fact from JPI's board. As noted above, defendants have offered no evidence to suggest that Morton knew Price had been instructed not to use JPI's money for the new facility, encouraged him to disregard that directive or concealed that fact from the board. (*See*

Defs.' LR 56.1(b)(3)(B) Stmt. ¶¶ 17-18, 27; Defs.' Ex. 22, Morton Dep. at 57 (stating that Price managed JPI, Morton did not know that Equipoise used JPI's money or that the JPI board had told Price not to do so.) Given those facts, Morton is entitled to judgment as a matter of law on the fraud claim asserted against him.

**Damages & Attorney's Fees**

Plaintiffs ask the Court to rule that defendants' damages are limited to $128,550.84, the amount of money plaintiffs allegedly misappropriated from JPI for the new facility. In Count 1 of the counterclaim, however, defendants assert a breach of contract claim against plaintiffs for their failure to sell the JPI stock back to ITEC after Price's termination. Plaintiffs did not move for summary judgment on that claim, so defendants were not required to, and did not, offer any evidence of their alleged damages on that claim. Under the circumstances, the Court has no basis for limiting defendants' damage claim to $128,000.00.

Plaintiffs also ask the Court to strike defendants' request for attorney's fees. Absent a statutory or contractual provision allowing their recovery, each party to litigation must pay its own attorney fees. *Vill. of Glenview v. Zwick*, 826 N.E.2d 1171, 1176 (Ill. App. Ct. 2005). Defendants have not identified a statute or contract provision that authorizes them to collect their fees from plaintiffs. Defendants' request for fees is, therefore, stricken.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact as to the claim plaintiffs assert against defendants in Count V of the first amended complaint, and defendants are entitled to judgment as a matter of law on that claim. Defendants' motion for summary judgment [doc. no. 114] is, therefore, granted as to that claim but is in all other respects denied. There is also no genuine issue of material fact as to the claims defendants assert against Morton in Counts III and VI of their counterclaim, and Morton is entitled to judgment as a matter of law on those claims. Plaintiffs' motion for summary judgment [doc. no. 117] is, therefore, granted as to those claims but is in all other respects denied. At the next status hearing, the parties should be prepared to set a trial date.

**SO ORDERED.**                    **ENTERED:**  $7/31/07$

**HON. RONALD A. GUZMAN**
**United States District Judge**